Merrill Stubbs and Gretchen Stubbs v. Commissioner.
Stubbs v. Commissioner
Docket No. 4554-62.
United States Tax Court
T.C. Memo 1965-177; 1965 Tax Ct. Memo LEXIS 157; 24 T.C.M. (CCH) 938; T.C.M. (RIA) 65177; June 28, 1965
*157 Held, on the facts, the sum of $13,365.80 paid to petitioners during the year 1958 does not represent interest income. C. Harold Taylor, Donald E. McNicol, Wilmot B. Mitchell, and J. Andrew Crafts, 41 E. 42nd St., New York, N. Y., for the petitioners. Eugene L. Wilpon, for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined a deficiency in the income tax of petitioners for the year 1958 in the amount of $6,682.90. The issue before us for decision is whether the sum of $13,365.80 paid to petitioners during the year 1958 represents interest income. Findings of Fact Most of the facts have been stipulated by the parties. Their stipulation, together with attached exhibits, is incorporated herein by this reference. Petitioners Merrill and Gretchen Stubbs are husband and wife residing in Essex, Connecticut. Their joint Federal income tax return for the year 1958, made on the cash basis and for the calendar year period, was filed with the district director of the then internal revenue district of Upper Manhattan. Merrill Stubbs (sometimes hereinafter referred to as Stubbs) is an individual principally engaged in *158 the investment business. Sometime in 1947 Stubbs, his wife Gretchen, and a group of asscciates acquired all of the stock of the Leach Relay Company (sometimes hereinafter referred to as the company), a corporation engaged in the manufacture of electrical relays for use in the aircraft industry. From the time of such acquisition until March 3, 1953, Stubbs was a vice president and director of the company. His duties were primarily the supplying of financial guidance and in the course thereof he was in close and continuous touch with the financial condition and affairs of the company. Sometime prior to March 1953 Stubbs was approached by an intermediary for outside interests with a tentative offer for the purchase of his stock and that of the other shareholders in the company. At the time, Stubbs owned 4,615 shares of the common stock of the company and 134 1/5 shares of the $5 cumulative preferred while his wife Gretchen owned 4,478 of the common and 130 1/5 shares of the preferred. Both were minority shareholders. The aggregate basis to Stubbs and his wife for the 9,093 shares of common and the 264 2/5 shares of preferred thus owned was $66.10 and all of such shares had been held *159 respectively by each for more than six months. Stubbs considered the offer which had been made an attractive one, and that a sale of his stock and that of his wife would be advisable. He therefore conveyed the offer to George Ohrstrom, the principal shareholder of the company. Ohrstrom indicated that he did not wish to sell his stock, but offered, instead, to cause the company to purchase the stock of Stubbs and his wife together with that of certain other minority shareholders. Thereafter, petitioners negotiated with the company the price, terms of payment and other conditions of agreements for the purchase of their stock by the company. Since there was no public market for such stock, the price and other terms of the sale were arrived at through negotiation and evaluation of the net worth and earning power of the company. At the time the company had a net worth of between $1,000,000 and $1,500,000 and its total assets were approximately $3,000,000. As a result of the aforementioned negotiations, Stubbs, on March 3, 1953, entered into an agreement with the company for the sale by him to the company of all of his stock for a total price of $82,645, to be paid in installments *160 as follows: 30% on March 10, 1953
$24,793.50
30% on March 10, 1954
24,793.50
30% on March 10, 1955
24,793.50
10% on March 10, 1956
8,264.50
$82,645.00 with interest at the rate of five percent per annum on the unpaid principal. On the same date, Gretchen Stubbs entered into an agreement with the company, identical except as to the number of shares and total purchase price, providing for the sale of her stock for a total price of $80,190 payable in installments as follows: 30% on March 10, 1953
$24,057.00
30% on March 10, 1954
24,057.00
30% on March 10, 1955
24,057.00
10% on March 10, 1956
8,019.00
$80,190.00 with interest at the rate of five percent per annum on the unpaid principal. The price and terms contained in these agreements were calculate to effect payment in full to petitioners as promptly as the parties thought the company could make such payment in light of its then financial condition and prospects. On March 10, 1953, both petitioners delivered the stock called for by the agreements to the company and received the agreed payments of 30 percent of the selling price. As of the same date Merrill Stubbs resigned his positions *161 as an officer and director of the company and thereafter neither he nor Gretchen Stubbs maintained any interest in or connection with the company except as creditors under the agreements for the sale of their stock. On March 10, 1954, payments of an additional 30 percent of the selling price, together with interest thereon, were timely made to petitioners by the company, leaving the following balances due to petitioners: Merrill Stubbs
$33,058
Gretchen Stubbs
32,076
$65,134 On their joint Federal income tax returns for the years 1953 and 1954 petitioners reported the payments thus made on the installment method. On March 10, 1955, the company failed to make the payments due petitioners of the third purchase price installment. Following the company's default, petitioners each formally demanded payment by letters dated April 9, 1955, addressed to the company. Thereafter, Merrill Stubbs, on behalf of his wife and himself, discussed the matter with the company's officers with a view to remedying the default. Stubbs was advised that the company was in financial difficulty; that the officers felt that $800,000 was required to put the company in a fairly good financial *162 condition; and that the company was therefore negotiating with the Bank of America National Trust and Savings Association (hereinafter referred to as the bank) for an extended line of credit in that amount. Stubbs was further advised that as a condition precedent to the extension of such additional credit to the company the bank required that petitioners subordinate their claims against the company to the bank's loan. Petitioners were requested to enter into agreements subordinating their claims to those of the bank and negotiations were entered into between petitioners and the company as to the basis upon which petitioners would agree to such subordination. In these negotiations petitioners took the position that, in light of the financial condition of the company as of March 1955, the possibility of its meeting the installment payments due under the purchase contracts of March 3, 1953, was deteriorating, and they insisted that the face value of the company's obligations to them be increased to compensate them for agreeing to the requested subordination. Subsequently, on June 14, 1955, both petitioners entered into identical agreements with the company, by the terms of which they *163 agreed to subordinate their claims against the company to those of the bank. In order to induce such subordination the company agreed, in part, with each petitioner as follows: Any principal amount of your claim unpaid as of the first day of March, 1956 and of each month thereafter shall be increased at the rate of 1/2 of 1 percent of such respective principal amount for each month or major fraction until payment to you is made in full. There shall, however, be no interest payable by the company on such increased principal amount. The modification agreements of June 14, 1955, were approved by the board of directors of the company on June 23, 1955. The minutes of that meeting and the resolution approving the agreements expressly refer to the additional payments to petitioners as principal. On June 23, 1955, both petitioners entered into subordination agreements with the bank under which, in order to induce the bank to extend a line of credit to the company totaling $800,000, they agreed to subordinate their claims to all indebtedness then or thereafter owing by the company to the bank. They further agreed not to sue upon or collect or receive payment of their indebtedness, nor *164 to enforce or apply any security, nor to join in any petition in bankruptcy or any assignment for the benefit of creditors or any creditors' agreement, nor to take any lien or security on any of the company's property so long as the company should be indebted to the bank. Additionally, they agreed that all indebtedness of the company to the bank should be paid in full before any payment of principal should be made by the company to them and that in the event of any bankruptcy or insolvency of, or similar proceedings against, the company they would assign to the bank all of their rights to any payment from the assets of the company. Thereafter, on March 10, 1956, the company again defaulted on the annual payments due petitioners under the original purchase agreements of March 3, 1953. Petitioners were advised that the company was suffering another financial crisis brought about, in part, by the Federal Government's determination that a renegotiation refund was due it by the company in the amount of $245,608.20. The company advised that it had negotiated an agreement with the Government permitting the payment of the refund in installments over a period of ten months, but that as a *165 condition precedent to entering into such agreement the Government would require petitioners to subordinate their claims against the company to the payment of the renegotiation refund. Petitioners were therefore requested by the company to enter into a further subordination agreement subordinating their claims to those of the Government as well as to the $800,000 bank debt. In the negotiations which followed, petitioners adopted the view that the proposed additional subordination represented another drastic change in the transaction to which they had originally agreed in March of 1953. They therefore insisted that a further upward adjustment of the principal of the purchase price be made to reflect the substantial degeneration in the ability of the company to meet its obligations to them. As a result, on August 21, 1956, both petitioners entered into identical agreements with the company, modifying the agreements of June 14, 1955, by the terms of which they agreed to subordinate their claims to the claim of the Federal Government. The company agreed with each petitioner that: Any principal amount of your claim * * * unpaid as of March 1, 1956, will be increased at the rate of 1/2 of *166 1 percent of such amount, less any repayments thereon, for each month or major fraction from March 1, 1956, through February, 1957, and thereafter such increase will be at the rate of 1 percent per month or major fraction, until payment to you is made in full. There shall, however, be no interest payable by the company on such increased principal amount. The agreements of August 21, 1956, were approved by the board of directors of the company at a meeting held on August 28, 1956. The minutes of that meeting and the resolution approving the agreements with petitioners expressly refer to the increased payments to petitioners as principal. On August 29, 1956, petitioners entered into a modification agreement with the company, the Government and certain other parties unrelated to these proceedings, pursuant to which the Government consented to the repayment of the company's renegotiation refund in the amount of $245,608.20 in installments over a period of ten months. In order to induce the Government to accept the deferred installment payments by the company, the petitioners: a. Agreed not to demand or receive from the company any part of the monies owing by the company to them, *167 or that might thereafter become due and payable to them, until the renegotiation liability of the company was fully paid, and to waive all notice of the creation, renewal extension or accrual of any obligations of the company to the Government; b. Agreed to assign all of their claims and demands against the company to the Government as collateral security for the renegotiation liability, irrevocably appointing the Government as their attorney to act for them and to collect and receive all payments that might be declared in any bankruptcy, insolvency, or similar proceedings against the company; c. Agreed to turn over to the Government any payments received from the company and to hold any such payments in trust for the Government until so delivered; d. Consented, without further notice, to renewal, extension, modification, compromise or release of the renegotiation liability; and e. Agreed not to accept any notes or other negotiable instruments, or writings, evidencing their claims and agreed to endorse and turn over to the Government any such note or other negotiable instruments. Interest at the rate of 5 percent per annum on the company's obligations to petitioners under *168 the original purchase agreements of March 3, 1953, was paid to petitioners by the company through March 10, 1957. On May 15, 1958, the company's obligations to petitioners under the agreements of March 3, 1953, as modified by the agreements of June 14, 1955, and August 21, 1956, were satisfied by the company's payment to petitioners of the following: a. Interest at the rate of 5 percent on the unpaid principal of the March 3, 1953, agreements from March 11, 1957, to date of payment in the amount of $3,844.72; b. The remaining 40 percent of the principal due under the original purchase agreements of March 3, 1953, in the amount of $65,134; and c. A total of $13,365.80 representing the additional amounts due petitioners under the agreements of June 14, 1955, and August 21, 1956. On their joint Federal income tax return for the year 1958 petitioners reported item (a), above, as "Income from Interest." Item (b) was reported as gain from the sale of Leach Relay Company stock, a long-term capital asset. Item (c) was also reported as gain on the sale of the Leach stock under the heading "Additional consideration received on installment sales contract per amendments thereto." *169 In his notice of deficiency respondent determined "that the amount of $13,365.80 [i.e., item (c)] reported by you as a longterm capital gain and described as 'Additional consideration received on installment sales contract per amendments thereto,' represents interest income to you; therefore, your interest income is increased by that amount and your capital gains income is reduced by the amount taken into account on that item * * *." Opinion Respondent maintains that the additional amounts paid to petitioners under the modification agreements of June 14, 1955, and August 21, 1956, constitute compensation for the forbearance of money, and that therefore such amounts are interest within the classic definition of that term, viz., "compensation allowed by law, or fixed by the parties, for the use or forbearance of money." , affd. (C.A. 2, 1941). Petitioners do not deny that forbearance, i.e., the giving of additional time within which a creditor may make payment after the obligation has become due and payable, was incidental to the modification agreements, but contend that the real purport of *170 such agreements, as bargained for and intended by the parties, was a complete revision of the original purchase agreements, with ramifications far and beyond the mere allowance to the company of additional time within which to make payment. It is petitioner's position that where parties to a contract under which money is owing agree, in consideration of additional payments by debtor to creditor, to amend the contract to effect radical changes in the original agreement, the fact that an extension of time for the debtor to pay is concomitant to the amended contract is not probative that the additional payments are compensation for the use or forbearance of money. We agree. What is basically at issue here is the intent of the parties to the various contracts and amendatory agreements under consideration. This intent is to be gleaned from all of the facts as well as from the language of the documents themselves. As we view the facts, petitioners, in March of 1953, negotiated a sale of their Leach stock for an agreed price to be paid in four installments over a period of three years with interest at the rate of 5 percent per annum on the unpaid balances. Upon entering into the agreements *171 of sale petitioners became general creditors of a completely solvent company possessing assets of over $3,000,000 and having a net worth of over $1,000,000. They were, as far as the record indicates, on a par with all other creditors of the company. Merrill Stubbs had, for the preceding six years, been intimately familiar with the financial condition of the company, and we are convinced that in arriving at the final terms and conditions of the sale petitioners were influenced by this knowledge. Two years later, in March of 1955, the situation had completely changed. Not only was the company unable to meet its installment obligations to petitioners in the amount of approximately $50,000, but it was compelled to borrow $800,000 in order to stay in business. In the following year a further deterioration occurred; the company became subject to an additional liability of almost a quarter of a million dollars to the Federal Government. In each case the situation required a complete revision of the company's original agreements with petitioners. As a result of the 1955 and 1956 modification agreements, petitioners subordinated their claims to more than $1,000,000 of senior debt to the *172 bank and to the Government. They were no longer general creditors on a par with other creditors looking to a healthy debtor. Pursuant to these agreements they gave up their right to receive payment of their claims, their right to assign, pledge or encumber such claims, and their right to join in any petition in bankruptcy or other creditors' proceeding. To all of this, the concomitant extension of time for the company to pay was merely incidental. We hold that the payments here may not be characterized as interest. Decision will be entered for the petitioners.